Ewing, C. J.
Upon the trial of the cause, at the Bergen Circuit, in October 1824, before the late Chief Justice, a non-suit was ordered, which the plaintiff now seeks to set aside.
From circumstances satisfactorily explained, on the argument at the bar, and not necessary to be farther adverted to, the facts as they occurred at the trial, are not exhibited to us in the usual manner. The documents laid before us, and the statements and admissions of the respective counsel, however, present in substance the following ■ case. The congregation of the Dutch church at Pornpton plains, are the owners of a tract of land called the parsonage land, of which, the title is vested in the trustees, chosen according to the usages of that church and agreeably to the act of the Legislature. This parsonage land was pro- *129 tided and designed for the use of the minister of that church, and to aid in his support, and was accordingly occupied by the incumbent for the time being. In the year 1815, the Rev. Mr. Field was the minister, and in the fall of that year he sowed part of the land with rye. Early in the spring of 1816 he sold the rye, in the ground, to one Romer, who afterwards sold it to the plaintiff. Antecedent to the 1st of May 1816, but after the sale, Mr. Field of his own act, and voluntarily, withdrew from the ministerial service, and ceased to be the minister of that church, left the parsonage land and removed to another congregation and place of residence. The rye was harvested by the defendants. The present action in trover was brought against them, and went to trial upon the plea of not guilty; and the Chief Justice3 being of opinion that the plaintiff had not shewn property ík ;he rye, directed a nonsuit.
In examining the propriety of the nonsuit, the first question to be resolved is, whether Mr. Field would himself have beets entitled to cut and carrry away the grain at maturity had no sale by him been made ? At the time he sowed the grain, he wat; the minister, in possession, and entitled to hold and enjoy the parsonage so long as he remained minister. The precise nature or apt denomination of the estate which he had in the premises, whether of freehold, or for years, or at will, needs not to bo sought. For the law of emblements, so far as may be necessary for the determination of this point will equally apply, whatever may be its name or nature. He who has an estate or interest in lands, the duration of which is uncertain in point of time, and he who has such an estate as may perhaps continue until the grain be ripe, shall, if he sows the land, be permitted, or his executors or administrators, in case of his decease, to enter upon it at harvest and reap the crop, although in the mean time his estate may have ended, either by the act of God or of the Law. Bui if the estate is between seed time and harvest, determined fey the act of the tenant, the growing crop passes with the ¡and, so him who thereupon becomes the immediate owner of the latter. Shep. Touch. 451. Co. Lit. 55. This is where a woman held an estate in lands during her widowhood, which is technically denominated an estate for. life, because it may last so long, and sowed the land and before severance married, the crop was adjudged to belong to the landlord of whom she held, and *130 not to her or her husband. Oland’s Case, 5 Co. 116. So if tenant for life commits wastes and thereby incurs a forfeiture, or if he surrenders his estate, or if tenant at will himself determines his will and refuses to occupy the ground; in these and similar cases, he loses the emblements. Cro. Eliz. 461. Co. Lit, 55, a. 2 Bl. Com. 123, 145. To apply these principles? Mr. Field, when'he sowed, had an estate which might have continued until the ensuing harvest. But in the mean time, by his own voluntary act, he put an end to the estate. He ceased then to be the owner of the growing crop, and could not have reaped it had no sale been made.
The enquiry results then, in the second place, what is the effect of that sale ? .Does it vest in the purshaser a greater right than would have remained in the seller, Mr. Field ? Shall the former hold, and may he take the crop, although as we have seen, the latter might not. The counsel of the plaintiff sought to maintain the affirmative, and relied on the rule which gives to the undertenants . or lessees of tenants for life, greater indulgences than their lessors, the tenants for life; as in the case of a woman who holds durante viduitate sua, if she leases her estate to an undertenant who sows the land and she then marries, lies’ act shall not deprive him of the emblements. This doctrine is sound ; yet it appears not to have been without question at one time, for Lord Coke, in his report of Oland’s Case, says expressly, the lessee of the widow shall not have the emblements, and the reason assigned is, that he shall not be, as to the first lessor, in a better condition than his own lessor was. But Croke in his report of the same case by the name of Oland v. Burdwick, Cro. Eliz. 461, states the opinion of the court to have been, that the lessee should have the emblements. The doctrine reported by Croke has been followed by Blackstone, and the writers and judges of modern times, and may now be considered as the correct and settled rule. But this rule always assumes the fact that the grain has been sown by the undertenant or lessee, and not by the tenant for life.
I have found no adjudged case, nor even a dictum, which gives the underlessee the crop where the grain has been sown, not by him but by his lessor. And just reason and sound principle would forbid such extension of the rule. Its foundation is due encouragement to husbandry, and the security of him whe *131 labors and sows from the effect of the acts of another not under his control. But the rule would be worthless from obvious, liability to evasion, if the widow might the hour before her marriage, or the tenant on the day antecedent to his commission of waste, avoid the consequence- of those acts by so simple a device as the sale of the crop. So far as we meet with any thing in the books, this distinction is recognised. In the case of Grantham v. Hawley, Hob, 132, it is said, if a man conveys an estate, which he has sowed, to A. for life, and A. dies before the crop is severed, the person who sowed it shall have it 3 and on the margin it is said, if the lessor sow it, and then convey the .and to A. for life, remainder to B» for life, and remainder to U. and both die, the lessor shall have the crop that he sowed. Not? -it is dear in these cases, that if A. and not the grantor, had sowed the grain, his executor or administrator would have takctt the crop. Hence a difference in the rule, from the person by whom the grain has been sown, is clearly evinced. In the case before us then, Mr. Field having sowed the crop could not vest in Roiner an higher or greater right over it than he himself held; and if by his act he has defeated any just expectation of the vendee, from him and not from these defendants should redress be sought.
On these considerations I am of opinion the nonsuit was rightly ordered.
As another reason for setting aside the nonsuit, the counsel of the plaintiff insisted that the cause should have been put to the jury upon the facts. I think otherwise. Upon the facts exhibited in evidence on the part of the plaintiff he had not shewn, in matter of law, property in himself in the rye in question, an indispensable pillar of his action. If the cause had been submitted to the jury, the duty of the judge would have been to have charged diem, that the plaintiff taking the facts to be true, had failed to shew a right to recover, and was not entitled to their verdict. A plaintiff may notask a jury for a verdict, and the judge may well prevent by a nonsuit, a verdict mistakenly rendered, and which afterwards must be set aside, if, on the plaintiff’s own case, un« controverted as to fact, the law is clearly against him. Moreover, fr„om the affidavits laid before us, it appears the plaintiff’s counsel, and wisely too, preferred a nonsuit; for after the opinion of ike judge, as to the legal effect of the voluntary removal of Mr. *132 Field, had been expressed, the counsel of the plaintiff said s “if that is the opinion of the court, the plaintiff must submit to a nonsuit, and he was accordingly nonsuited.” I remark wisely, for he has thereby secured to his client, the plaintiff, review of the legal questions here, and an opportunity if the opinion of this court should be against him, to make out in another action, a better case in point of fact, if fact will warrant it.
Another reason for setting aside the nonsuit is, that legal evidence offered fay the plaintiff was overruled. In the course of the trial he. offered to read to the jury a resolution of the consistory of the church, adopted on the 29th November 1817, to the following effect: “ that this body disavows any claim to the grain mentioned in the resolution of the 4th of May 1816, and declare that said resolution was passed in anticipation of an expected purchase, which has never been realized.” The resolve of the 4th of May 1816 was, that “ Paul Debow take particular care of the grain on the parsonage lot, lying in Bergen county, and that he shall be satisfied for bis trouble.” The evidence of the resolve, of November 1817, because it amounted at the most, only to a disclaimer on the part of the church, but vested no title in the plaintiff, was Overruled. And in my opinion, rightly. The question depended on the title or property of the plaintiff in the rye. If he legally acquired none, under the purchase by Romer from Mr. Field, he had none, nor could any mere disavowal pr disclaimer on the part of the consistory supply, or tend to supply the want. A very different case might have been presented, if a valid act on the part of the corporation, made in due season, and antecedent to the harvest, transferring to Paul Debow their property in the rye, had been produced. But as was justly remarked by the judge, it was no more, in its most liberal acceptation, than a disavowal on their part, not a transfer $ and if indeed a transfer of what avail to establish a legal title in the plaintiff, could have been their transfer of a chose in action In November 1817, upwards of a year after the rye had been cut, and in the possession of the defendants ?
An undue weight seemed on the argument at the bar, to be attributed to the fact that an action for the taking of the rye had been commenced in a Justice’s Court, to which these defendants had filed a plea of title. The plaintiff however in this court accepted, without objection, the plea of not guilty, and went to *133 trial upon if. The title of the defendants or of the church, or of any other person than the plaintiff was not therefore the subject of enquiry, until he had shewn in himself a title prima facie "slid in law and fact.
Lot the nonsuit stand.